UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

========================================

| | |
|---|---|
| William Whittman | ) |
| 102 Burns Crossings Rd | ) |
| Severn, MD 21144 | ) |
| (202) 391-5582 | ) |
| samigjoka@yahoo.com | ) |
| *Plaintiff* | ) |
| V | ) |
| Associa, Associations, Inc., | ) |
| 5401 N. Central Expressway, Suite 300 | ) |
| Dallas, TX 75205 | ) |
| P: 800 808-4882 | ) |
| | ) |
| CMC (Community Management Corporation) | ) |
| 1415 Old Mill Circle, | ) |
| Winston-Salem, NC 27103 | ) |
| Phone: 336-765-0424 | ) |
| | ) |
| Woodburn Village Condominium Unit Owners | ) |
| Association and/ or Woodburn Vlg Condo Unit | ) |
| Owners (The association) | ) |
| 3380 Woodburn Rd | ) |
| Annandale, VA 22003 | ) |
| Ph. (703) 698-1050 | ) |
| *Defendants* | ) |

Case No. 1:21CV77 RDA/TCB

**Jury Trial Demanded**

## THE NATURE OF THIS CASE

This is a *Fair Housing Discrimination* Case regarding the defendants' unlawful and heinous acts to get rid of a mentally disabled tenant, by means of desperate treatment and under false pretenses. The Fair Housing *Act of 1968, as updated in 1988*, provides remedies for the victims of discrimination in the housing industry. *42 U.S. Code §§ 3601-3619, 3631* forbids discrimination based on disability and *Section 504* and *ADA Title II* extend this protection to the family members living with persons with disability.

<u>ONE PAGE SUMMERY OF THE COMPLAINT</u>

**I. What kind of case is this?**

This Discrimination Case, invoking a Federal Question is brought to this Federal Forum, Under Title VIII of the Fair Housing Act of 1988 and *FHA, Section 504* and *ADA Title II.* that extend protection against discrimination to the *FAMILY MEMBERS*, associating or living with a disabled person:

**II. Why in Federal Court?**

. The Federal District Courts have original Subject Matter Jurisdiction uver all civil actions arising under the laws of the United States. (28 U.S. Code § 1331).

**III. Why in Alexandria Division?**

Because all happened here, in the Fairfax County.

**IV. What is this case about?**

Is about of a family of three, (*father and sons*) who have suffered tremendously in the hands of the defendants, with the same rights and privileges that others enjoy, to get rid of a disabled tenant, under false pretenses and to force the family of the disabled tenant out of this subdivision, by means of desperate treatment, tricking, inducing and forcing others (*their residents and the landlords*) to act as their pawns and do their dirty job for them, as soon as they learned that plaintiff's sons, Kleot was mentally disabled and this mental disability if his made a few owner-residents, who have a say in this association's affairs, by means of ownership, not very happy to have to share the same common area elements, with him.

## COMPLAINT

Plaintiff William Whittman (Pro-Se), brings this Acton for relief, under *Title VIII* of the *Fair Housing Act of 1988*, which amended the *Federal Civil Act of 1968* to include *DISABLED TENANTS*, as a protected class, and under, *FHA, Section 504* and *ADA Title II* that extend protection against discrimination to the *FAMILY MEMBERS*, associating or living with the disabled person, or persons perceived to be disabled and in support thereof, plaintiff states the following:

1.      Plaintiff and his family have suffered tremendously at the hands of these defendants, with rights and privileges that others enjoy, denied to them, to force them out by means of desperate treatment, because plaintiff's older son, Kleot, is mentally disabled, and this disability of his made a few owner residents in this subdivision, who have a say in the association affairs, by means of ownership, not very happy.

2.      Pursuant to *Rule 8* of the Civil Procedure this pleading contains: (1) a short and plain statement of the Grounds for the Court's Jurisdiction *(see ¶3)*, (2) a short and plain statement showing Plaintiff's Entitlement to Relief; *(see ¶9)* and (3) the Demand for Relief *(¶33 to 36)* as well as, (4) the Relief in the Alternative *(¶35)*.

## JURISDICTION AND VENUE

### Jurisdiction

3.      Subject Matter Jurisdiction. The Federal District Courts have original jurisdiction of all civil actions arising under the laws of the United States. (28 U.S. Code § 1331).

### Venue

4.      Venue is proper in the Alexandria Division of the Eastern District Court of Virginia pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2), because all happened here, in Fairfax County.

## PARTIES

5.     *WILLIAM WHITTMAN*, (Aka Sami Gjoka) is natural persons, (US Citizens) and his current address is: *102 Burns Crossing Rd, Severn, MD 21144. Ph. (202) 391-5582. E-mail*

*samigjoka@yahoo.com.*

6.     *ASSOCIA* (Associations, Inc., Entity ID F1653320) is a Texas Foreign Company authorized to conduct business in Virginia. Its principal office is: *5401 N. Central Expressway, Suite 300. Dallas, TX 75205. Ph. (800) 808-4882* and its Virginia registered agent to receive service is; *C T CORPORATION SYSTEM 4701 Cox Rd, Suite 285, Glen Allen, VA, 23060 - 6808, USA*

7.     *CMC* (Community Management Corporation, (Entity ID  01310036) is a VA Company with its Principal Office Address at: *4840 Wetfields Blvd #300, Chantilly, VA 20151 Phone: (703) 631-7200* and its registered agent is *C T CORPORATION SYSTEM 100 Shockoe Slip Fl 2, Richmond, VA, 23219 - 4100, USA*

8.     *WOODBURN VILLAGE CONDOMINIUM UNIT OWNERS ASSOCIATION* and/or Woodburn Vlg Condo Unit Owners is a privately held company established in 1981 and incorporated in VA. It's location of business is: *Woodburn Vlg Condo Unit Owners 3380 Woodburn Rd. Annandale, VA 22003 Ph. (703) 698-1050.*

## THE LEGAL BASIS

9.     Plaintiff's Legal Basis to state a Claim for relief, against these defendants, lie on *FHA, Section 504* and *ADA Title II* that *Extend Protection to Family Members* of the disabled person(s) and *Provide Remedies* against discrimination to both the disabled person and the *Family Members* associating with or living with the disabled person.

10. The provided *Remedies* are: *(1) Actual Damages, including humiliation, pain, and suffering, (2) Reasonable Attorney's Fees and Costs, (3) Punitive Damages and (4) Civil Penalties.*

11. *Title VIII* of the Fair Housing Act, makes it illegal to deny disabled tenants the rights to the quality of live, that others enjoy and that cannot be denied to others.

12. Under the Fair Housing Act, the Homeowners' Associations (HOAs), the Landlords, and or their agents must provide reasonable accommodation to people with disabilities so such individuals may have an equal opportunity to use a dwelling.

13. Refusing to Allow Reasonable Modifications to prevent a disabled tenant equally enjoyment of a dwelling is an Illegal Desperate Treatment, *(422 U.S.C. §§ 3601-3619).*

14. Under the Americans with Disabilities Act, a person with a disability is someone who has any of the following: *(1). A physical or mental impairment that substantially limits a "major life activity", (2). A record of such an impairment and/or (3). The person is regarded as having such an impairment*

15. Pursuant to the Federal Laws, persons with a disability, have rights to *reasonable accommodations* related to their special needs, even if their needs are different from the policies or structures related to the apartment or building(s). otherwise civil penalties can be imposed.

### Civil Penalties for Federal Fair Housing Violations

16. Civil Penalties for Federal Fair Housing Violations are subject to inflation adjustments.

17. *The Current* Civil Penalties as determined by HUD and that can be imposed from HUD varies from $21,410.00 for a first violation to over $100,000.00 for the third consecutive violation within seven years with courts having discretion for much harsher penalties.

18.     There are at least 13 Federal Fair Housing Violations in this case that gave rise to this legal action for relief.

**Counts of Violations**

19.     *Count 1.* Refusing to fix, (*repair or replace*) a malfunctioning material object, (*the main unit door*), despite the fact that they were made aware of this urgent and necessary repair in writing and were made aware of plaintiff's son mental disability making such repair even more urgent.

20.     *Count 2.* Using the malfunctioning of this material object, that they refuse to repair to force plaintiff out by means of *desperate treatment.*

21.     *Count 3.* Intentionally and deliberately misrepresenting this malfunctioning material object that they knew to be malfunctioning, to the landlords and their rental managing agents, to trick, induce and force them, to evict the disabled tenant, for them and in their behalf, under false pretenses.

22.     *Count 4.* Engaging in *Malicious Interferences with the Contract of Others* to force others, (the landlords and their agents), to evict the disabled tenant, that tricked and induced and encouraged and the landlords to *constructively evict plaintiff's family* from this subdivision, since the beginning of the lease.

23.     *Count 5.* Using this malfunctioning material object that they refused to fix, to create hardship to the other residents in the, *to coerce* the residents to complaint against plaintiff and corroborate with them to evict plaintiff, under false pretenses.

24.     *Count 6.* Instructing and mentoring their residents, (*in writing*) to help them evict the disabled tenant's family by soliciting corroboration under false pretenses to use such corroboration, as a substitute for the material facts they did not have, to form the legal basis to evict the disabled tenant.

25.     *Count 7.* Making false accusations to the landlords and their agents that the plaintiffs family was engaging in criminal activities, harassing, threatening the landlords from their position of superiority to put a stop to such criminal acts *within 10 days* while admitting, they had no facts spurting their accusation.

26.     *Count 8.* Instructing, tricking, inducing, the residents to engage in malicious prosecution against plaintiff, calling the Police Department to plaintiff's home. to terrorize and torment plaintiffs family till plaintiff was forced out "voluntarily".

27.     *Count 9.* Using the malicious prosecution , to intentionally and deliberately inflict severe mental distress and emotional pain and suffering to plaintiff's family for refusing to move out "voluntarily".

28.     *Count 10.* Continuing to call the law enforcements to plaintiff's home, regardless that each of their *(malicious prosecution)* terminated in plaintiff's favor, with the sole purpose of , vilifying plaintiff's family in the eyes of the neighbors. and build a hostile environment for plaintiff in that subdivision.

29.     *Count 11.* Threatening and warning the landlords, to engage in *acts of SELF-HELP* and evict plaintiff, based on their unproven accusation of criminal conduct and behaviors, after of the police involvement proved them wrong and as pathetic liars.

30.     *Count 12..RETALIATING* against plaintiff. after being informed that plaintiff was taking legal action against them, towing plaintiff's car from plaintiff assigned parking lot. where plaintiff had parked undisturbed for the entire year, under the pretext that the parking decal had expired.

31.     *Count 13.* Engaging in unlawfully acts of entering plaintiff's home without any prior notice, and as they pleased to bully and victimize and dehumanize and vilify plaintiff, under the false pretenses of emergencies when no emergency of any kind was present.

**Remedies Available** *(See also the Demand for Relief Section at the end of the Complaint).*

32. The Court can award, punitive damages against defendants for their discriminatory acts and Plaintiff Asks for *PUNITIVE DAMAGES.*

33. The Court can award *reasonable attorney's fees and Court Cost* and Plaintiff Asks for *REASONABLE ATTORNEY'S FEES AND COURT COST.*

34. Victims of the discrimination in the housing industries are entitled to *ACTUAL DAMAGES,* including *humiliation, pain, and suffering* and although there is no dollar amount that will make plaintiff's kids whole again, with permanent scars in their body and soul for as long as they live, plaintiff put a dollar amount for all his family's pain and suffering to *20 million dollars or IN THE ALTERNATIVE, whatever dollar amount the jury finds right and just for ACTUAL DAMAGES.*

35. Plaintiff is entitled to a jury trial and *PLAINTIFF DEMANDS A JURY TRAIL*

## STATEMENT OF FACTS

**Acts in the Background**

36. Sometime on February 2018, Plaintiff found out that a residential condo unit (*Unit, #12*). located at; 3326 Woodburn Village Dr., Annandale, VA 22003 was listed for rent.

37. This unit is part of the Woodburn Village Condominium Unit Owners Association.

38. Defendants' manage this condominium subdivision from their office located inside this subdivision, at 3380 Woodburn Rd. Annandale, VA 22003.

39. This subdivision is in a walking distance to Merrifield Mental Health Center.

40.     Merrifield is located at 8221 Willow Oaks Corporate Dr., in Fairfax, VA.

41.     Plaintiff used to take his older son, Kleot, there for his treatment.

42.      Plaintiff is a single parent, father of two boys, Kleot and Arbin.

43.     Kleot is mentally disabled.



44.     Arbin, was a minor at that time (*15-16 years old*).

45.     Plaintiff has no other family members, living with him to help him with his children.

46.     Kleot could walk there whenever plaintiff wasn't available to take him.

47.      Plaintiff went to see this unit, as soon as it became available.

48.     The unit was listed by *Premiere Realty* with *Xin Tao*, as the supervising broker.

49.     Plaintiff liked this unit, when he saw it for the fact that it was close to Merrifield.

50.     When plaintiff saw this unit it was in need of some urgent repairs.

51.      Plaintiff contacted the listing agent, about it.

52.     Mr. Wang, assured plaintiff that the unit would be rent-ready by the end of the month.

53.     Plaintiff had learned, through his sad and painful experience, since his son lost his mind, that in order for him to qualify, with a mentally disabled child, as a potential occupant, he would have to stretch beyond his means and risk more than others do, for the same property.

54.     For this reason, plaintiff offered to pay his entire annual rent, upfront and in advance, in one big sum.

55.     Plaintiff offer to make such a payment before the unit was even made rent-ready to reduce competition and loose it to a "better" family.

56.     With his entire annual rent paid up-front, and in advance, plaintiff was approved.

57.     Plaintiff and the listing agent decided to meet on 2/21/18 inside the unit and sign the lease in person.

58.     When they met the repairs were not done.

59.     Plaintiff took pictures of the objects not repaired with the listing agent present.



60.     The listing agent assured plaintiff again that everything would be done by the end of the month.

61.    The lease was to begin on March 1, 2018.

62.    Plaintiff signed the lease, in good faith, and signed for his kids, as well, who were not present and who could not sign because of their incompetency,

63.    Plaintiff paid, that day, his entire annual rent of $20,000.00 plus the security deposit of $1660.00. and got the unit keys from the listing agent.





**Acts that Gave Rise to these Causes of Action;**

64.    After signing the lease, plaintiff went straight to these three defendants' office, located within this condominium complex at; 3380 Woodburn Rd. Annandale, VA 22003.

65.     Plaintiff introduced himself to the defendants, (*Feb. 21, 2018*), telling them that he was moving there on 3, 1, 2018.

66.     Plaintiff asked the defendants if they could open the gate, separating the parking lot from the driveway to the building entrance, that they keep locked to facilitate his move, that day.



67.     The building entrance is far from the parking lot, and up the hill, making it hard to carry heavy furniture, plus that it was expected to rain the day.



68.     Defendants said to plaintiff that they could not help him because the Fire Department did not allow them to do so.

69.     Plaintiff had no reason to suspect that this was an Act of discrimination on their part.

70.     Defendant (ASSOCIA), who manages this place is one of the largest Rental Management Companies in the entire world, having more than 9000 employs under its payroll in North America alone to know better than engage in discriminatory acts in the performance of their daily work.



71.     Defendant (CMC), is an ASSOCIA company, *specializes in managing Home Owners Association,* to known better than engage in acts of discrimination.





72.     Plaintiff soon learned, while residing there, that these three defendants had no problem

discriminating, as they pleased, in their daily business routine, allowing unrestricted use of that driveway, th

they did not allow to him, to others, and this hurt plaintiff deeply and troubled him immensely, feeling

unfairly and unequally treated.

73.     The Fairfax County Fire Department, would not have dared to engage in discriminatory

practices, as to pick and choose, who among their employees and residents should and who should be allow

to use that driveway.

74.     Plaintiff would have to witness, time and again, that these three defendants had no problem

allowing others (*residents and employees)* use that driveway, that they would not allow to plaintiff.



75.     Because of these routine discriminatory practices, plaintiff's family would have to suffer

tremendous pain and suffering, for the entire time they lived there, with rights and privileges, that others

enjoy, denied to them, simply because plaintiff's son, Kleot, was mentally disabled and this mental disability

of his made a few owner-residents, who have a say in the association affairs by means of ownership, not ver

happy to have to share the same common area elements with a mentally impaired individual.

76.     Plaintiff moved into this complex on March, 1, 2018.

77.     When Plaintiff moved in, none of the repairs to make this unit habitable was done.

78.     The broken, non-functioning doorbell, installed in the inner part of the main unit door, was still there with its wires exposed, as if the unit was still in the midst of the renovation.

79     The smoke detector, in the plaintiff's home would go off for nothing, forcing plaintiff to ope the balcony door and the kitchen windows, and to turn on the ceiling fan and the exhaust fan, on the kitchen all at once, no matter how hot or cold it was outside, even if plaintiff tried to fry an egg, because the smoke detector was malfunctioning and because the stove, released a lot of gas before it ever lit.



80.     The stove did not turn on easy and you could burn your fingers, trying to lit it while it kept releasing gas, triggering the smoke detector to go off, and posing the threat of gas explosion.

81.     This malfunctioning, gas leaking stove became even a more urgent to be fixed (*replaced*), fo: the fact that plaintiff had a mentally disabled son living with him.

82.     Any time Kleot tried to turn on the stove, to warm up anything to eat, he would give up, after the stove would not lit with the smoke starting to beep, making him giggle and stare at the smoke detector, with amazement, as if it was an entertaining game for him and then get forgetful and go to his room, while t gas kept feeling the room and, and at least once, the Fire Department had to rush into plaintiff's home, to tur it off, cautioning plaintiff's family to better not use it, to avoid any danger. (*How were they informed plainti has no information*).

83.     The main toilet between the living room and the bedrooms was not flashing.

84.     Plaintiff had to flash it by pouring water into it with a big bucket, he was forced to keep in the bathroom, for this reason, and this forced plaintiff to cut ties with his close family members when he needed them the most, to support him with his kids, out of embarrassment and shame, how he lived in that home, that he had paid in full and in advance to have a decent livable home for his family, except his aged mother who came to help plaintiff's kids, with the presence of the grandmother in a broken and struggling family, while in fact she needed care more from plaintiff because of the age.

85.     The light fixture in the kitchen ceiling was loose and falling, posing a dangerous threat of sparking electrical fire that could engulf the entire building.

86.     And yet, as soon as plaintiff relocated here, he realized that the most urgent thing, for him to be fixed, was the condition inside but the *Main Unit Door*, which closed with tremendous force, by itself, as if a powerful wind blew it closed, making an unusual loud noise and shaking the stairwell, as if a powerful wind shut it closed.

87.     The buildings in this complex, plaintiff realized, have a major structural defect that the lightest footsteps on the units above are very disturbingly heard to the units below.

88.     For this reason 70-80% of the unit floors, in this complex, are required to be covered.

89.     This defective door was, for this reason, in need of urgent repair not only for the quiet enjoyment of plaintiff's family but for his neighbors as well.

90.     Fixing this malfunctioning door was even more urgent, in plaintiff's case, because of plaintiff's son's mental disability, forcing him to pace often in and out of that door, (*symptoms of his illness*).

91.     Kleot suffers from *severe clinical depression*, *anxiety* and *post traumatic disorder*, making him pace often in and out of the unit.



Whittman, Kleot K (MRN: 03831890) DOB: 05/15/1998                                    Page 1 of 13

Select Font Size                                                                              ⊛

Fairfax Hospital Emergency Dept
3300 Gallows Road
Falls Church VA 22042
Phone: 703-776-3116

Kleot K Whittman              Department: Fairfax Hospital Emergency Dept
MRN: 03831890                 Date of Visit: 12/11/2016

Diagnoses this visit
    Your diagnoses were POST TRAUMATIC STRESS DISORDER and ANXIETY.

Follow up- Additional Information
    All locations for follow-up providers may not be listed, so please ask for the location closest to you

92.     The very first night in this place, plaintiff heard a lot of noises coming from above, as if high heels and chair-scratches on floor and plaintiff waited, till the next morning to go to tell the neighbors if they could keep down the noise during the quiet hours.

83.     When the neighbor opened the door, plaintiff noticed that the entire floor was covered with rugs, and it was very well kept.

94.     Plaintiff felled embarrassed and explained why he had come apologizing to the neighbor who was also very polite and understanding, that even with the carpet the noises were too much to the unit below.

95.     Plaintiff understood that the disturbing noises, coming from above, were not the neighbor's fault but a structural defect in that building that he had to learn to live with, especially over the kitchen area, *(the neighbors directly above plaintiff, had a habit of staying late till very alter and were up very early in the morning, appearing to be tens of persons living there although a small family a couples and two kids)*, but those noises were nothing compared to what waited plaintiff ahead with the slumming-like-kind of noise of his own defective door.

96.     The loud noise of his malfunctioning door, made it hard for plaintiff and his minor child, Arbin to sleep, at night and plaintiff imagined how hard it must be for others in the building.

97. Plaintiff was more worried that the neighbors, seeing his mental disabled son, pace often in and out would conclude, wrongfully, that his son was slumming the door, having no clue that the door was malfunctioning.

98. Even plaintiff himself and his minor child, Arbin, thought at first that Kleot was slumming it.

99. Plaintiff and Arbin, kept telling Kleot, at first, to stop slumming the door.

100. Kleot was getting agitated and defensive, claiming he was not slumming it.

101. Plaintiff and Arbin, were both trying to reason with Kleot, knowing that if Kleot felt that he was *accused for things he had not done*, it would *trigger mental distress* on him.

102. To see if Kleot was slumming the door, Plaintiff sat in the living room, pretending to watch TV while in fact paying attention if Kleot was slumming the door, while pacing in and out.

103. Plaintiff observed and realized quick that it was not his son slumming the door but the door closed forcefully and loudly by itself, making that unusual loud noise and vibrating the wall, with Kleot stopping surprised, every time, to look back why the door made that loud noise.

104. Plaintiff felt sad and heartbroken, seeing his son stop at the door and look back, confused and distressed why the door slummed nosily behind him, making *his father and younger brother* blame him for no reason.



105.    Plaintiff felt he had made a mistake to move in, and pay the entire annual year upfront and in advance before the unit was made rent-ready, having no leverage to enforce repairs should the landlords fail to make the unit livable now that he was already inside with the entire annual rent already in their account.

106.    Plaintiff also thought that perhaps all the doors, in that complex, had the same defect but the other residents had perhaps learned to subconsciously hold their doors gently, not letting them out of their hands, as plaintiff and his younger son were doing, holding it with extreme care to avoid it from slumming hard by itself.

107.    Plaintiff knew, on the other hand, that even if all the doors, in that complex, had that same problem, which they did not, defendants, in his case, had a legal obligation, duty and requirement repair it, to accommodate the family of the disabled tenant with this very reasonable and necessary accommodations.

108.    Plaintiff did not know, at that time, that his unit door was the only one malfunctioning.

109.    Being considerate of others. plaintiff was more concerned about others than himself, having two kids, living in an uninhabitable home that he had paid in full and in advance to have it livable.

110.    Plaintiff knew that he could demand the repair of that door at any time, with the law in his side, as well as forcefully demand all the repairs he had paid for in full and in advance to the landlords to, but plaintiff wanted to avoid appearing as too demanding and to burdensome, just because the law was in his side regarding these urgent and very reasonable repairs for which he had already paid in full and in advance.

111.    With everything going on in his life, plaintiff had no energy, no will and no desire to create enemies and hostilities where he lived, although he was entitled to a reasonably livable home, by both the law and by his payment, he had made in full and in advance.

112.    The last thing plaintiff wanted to do was to create enemies among his neighbors and create friction between him and the condo association, their management companies and his landlords.

113.   Plaintiff decided to approach them with a humble manner, from his position of inferiority, informing them of things that needed to be repaired urgently without appearing to demanding and too burdensome, taking advantage of his family misfortune that is protected by both state and federal laws.

114.   Plaintiff decided to inform all the parties; the d*efendants, the landlords, the real estate agents managing and his neighbors,* at once, about the defective door and to explain to them that his son was mentally disability to understand the urgency of repairing that door even if all other doors were defective, just the same as his.

115.   Plaintiff was under impression that the defendants, the landlords and their agents would promptly act to fix the door, even if all the doors in that building were malfunctioning, just as same as his, not to be in violation of both the *State Law, (VA Code §36-96.3:2),* and of the *Federal Fair Housing Laws, (Act 422 U.S.C. §§ 3601-3619)* that make it illegal to deny reasonable accommodations, to disabled persons or their families, that prevents a disabled tenant, as well as the family members living with the disabled person, to equally enjoy the dwelling.

116.   Plaintiff addressed that letter to all of them.

117.   Plaintiff explained in that letter that his door was malfunctioning and that his son had lost his mind a year earlier, making it clear to them that the door needed to be fixed urgently for two reasons, (1) *because it was malfunctioning* and (2) *because of the disability of his son.*

118.   Plaintiff e-mailed that letter to the three defendants' e-mail addresses and to the landlords and their agents and he hand delivered copies of that letter to each of the units in the building on 3.15, 18.

119.   Plaintiff was sure that whoever was responsible to fix that door, would promptly do so for the quite enjoyment of everyone in the building and to accommodate a mentally disabled person.

120.    Defendants, in direct violation of the law, chose to ignore and chose not to repair that defective but rather selected to keep it malfunctioning to cowardly and illegally use it as a pretext to evict the disabled tenant and his family, from this subdivision, under false pretenses.

3/15/18

To:     **Neighbours of Unit 12**
        3326Woodburn Village Drive
                and
To:     **Operations Manager**
        WOODBURN VILLAGE CONDOMINIUM UNIT OWNERS ASSOCIATION

Dear Neighbours and Dear Operations Manager, my name is William Whittman and I go by my Albanian name, Sami.

I have recently moved to Unit 12 on 3326 Woodburn Village Drive and I I am writing to you to apologies.

My older Son Kleit lost his mind last year. and is struggling with his condition.  He used to be a very brilliant kid but life hits you when you do not expect some times.

He often is pacing in and out of our home and he forgets to hold the door that slams hard when it closes by itself.

The landlord left the unit 90% covered with rug-like tappets and I thought will be enough to absorb the noise. But I realize this is not true because as soon as we moved in, I was hearing steps from the unit directly above us that seemed to vibrate the whole building and it does not feel like someone walks but jumps on the floor.

I went to let the residents above know and their unit too was covered with rugs and that was nothing they could do.  I was sure my son, pacing in and out could be worst for our neighbors downstairs.

I received a complains letter from the management office and I feel very bad about it. Embarrassed because I know from the experience how good, professional and pleasant to the residents these people in our management are because as a realtor I deal with many associations and management.

I beg you from the bottom of my heart to understand that there is nothing more I detest than not being a good neighbor.

At the end of this month my son is scheduled to have his usual shot and I hope that will improve his condition a little.

Kindly yours
Sami, from unit 12

121.    Plaintiff, like any other reasonable person, would not have believed that a condominium association, managed by one of largest rental management companies, ever in the entire world, (ASSOCIA), would deny, to known protected classes, in such flagrant violation of the fair housing laws. such urgent and necessary repairs, that they would not have denied to others.

122.    These three defendants and because of defendant's illegal agenda, enrichment others as well, *(landlords and their agents for greed and unjust enrichment)* chose to ignore this urgent, necessary and

reasonable repair, in violations of *Act 42 U.S.C. §§ 3601*, for the entire term of the lease, to force him out by means of *Desperate Treatment*.

123.    Defendants refused to even acknowledge this urgent need for repair and/or accommodation, while, as despicable, heinous and outrageous, as it sounds, using this exact unusual loud noise of this malfunctioning door that they refused to fix, *as a pretext to get rid, of a family with a mentally disabled tenant, by intentionally and deliberately misrepresenting it to the landlords, to trick, induce and force the landlords to evict plaintiff, for them and in their behalf* under false pretenses, from their subdivision.

124.    To get rid of the disabled tenant, under false pretenses without suffering any legal consequences, for doing this, defendants tried to trick and tricked and induced and forced others (*the landlords, and their agents*) to act, as their pawns, and do their dirty job for them.

125.    Tricked, forced and induced by these defendants' ulterior motives, the landlords and their agents *CONSTRUCTIVELY EVICTED PLAINTIFF*, since day one, refusing to make the unit livable.

126.    Had plaintiff not paid the entire annual rent upfront, and in advance before he even moved in and before the unit was even made rent-ready, plaintiff would have left this subdivision, in a heartbeat, for the safety and the wellbeing of his kids.

127.    Plaintiff could not afford to lose $22,000.00 (*Rent and Security Deposit)* to move out, before the lease was over and be accused for breaching it.

128.    To understand why the landlords and their agents were so easily persuaded to *Constrictively Evict* plaintiff, the Court must be made aware of tow *Adjudicative Facts* and take *Judicial Notice* of these two facts:

129.    *Fact One*. Defendants' legal representative, *Rees Broome, PC., and Kathleen N. Machado* had sued the landlords' agents. *(Premier Realty and Xin Tao)* before, in the Fairfax County GDC, in a totally

unrelated matter, and had won a momentary judgment against them, putting the defendants in a position of superiority to bully them, with the same council over any legal disputes in the future.

130.   *Fact Two*. The landlords were prepaid, in full and in advance for the entire annual rent before the unit was even made rent-ready and by *constructively evicting plaintiff*, to please these defendants, it benefited them as well with *unjust enrichment*, having no need to fix things for which they were paid for and still have the opportunity to rent the same place for double rental income, to another tenant.

131.   These are the two reasons why the landlords and their agents chose not to tell these defendants to stop harassing, threatening and accusing their tenants under false pretenses, or produce factual evidence that plaintiff had done something wrong before threatening the landlords to evict the tenants, in their behalf.

132.   Understating that the defendants were not interested to provide reasonable accommodations to their disabled tenant otherwise they would have taken urgent steps to correct their malfunctioning material objects, the landlords chose to acts as tricked and induced and forced to evict plaintiff with no factual or legal basis to do so and under false pretenses, encouraged and motivated to for their unjust enrichment.

133.   As a direct result of these defendants premeditated actions to force the landlords to evict plaintiff under false pretense, the landlords and their agents denied plaintiff a habitable rental going as far as refusing to repair even material objects that could endanger the life of the entire residents, in that building, as with the gas leaking stove and the falling electrical fixture from the ceiling, that could spark electrical fire to engulf the biding, forcing plaintiff to threaten the landlords that he had no other chose to avoid such catastrophic potential disaster but call other places for help.



134.     Tricked, induced and forced, as well, as encouraged and motivated by these defendants' refusal

to fix the same martial object that they kept complaining about, using it as a pretext to evict plaintiff, under

false pretenses, the landlords were glad to *Constructively Evict* plaintiff, for them and in their behalf, telling

plaintiff even when plaintiff asked to fix the non-flushing toilet and even with plaintiff's money, regardless

that plaintiff had already paid the entire annual rent upfront and in advance to have everything fixed, "*what's wrong with the toilet now*" implying "don't we have enough from you already.



135.    When plaintiff send his apologizing letter to all of them on 3, 15,2018 defendants had already complained to the landlords and their agents, against plaintiff, with their own letter of March 6, 2018.

136.    Defendants' letter mentioned nothing about the door noise, while raising some serious accusations about alleged conducts and behaviors that if true, take hours if not days to manifest and that could not have happened in a flash of a second, for them not to have one single material evidence to substantiate their false accusations.

137.    Defendants; (ASSOCIA this case) being one of the largest Rental Management Companies in the entire world with more 9000 employs, under its payroll, in North America alone and CMC, an ASSOCIA Affiliate are trained Rental Property Management Companies to know better than accuse a mentally disabled tenant, under false pretenses, with no prove, for their illegal and ulterior motives, despite the fact that these defendants are 24-hour present in this complex to tell the landlords that they had heard some rumors from some "concerned" residents that they could not verify, and ordering the landlords from their position of superiority to stop within 10 days, what they could not prove to have taken place or face repercussion.

*The* **Condominiums** *at* **Woodburn**
**Woodburn Village Unit Owners Association**
**3380 Woodburn Road • Annandale, VA 22003**
**703.698.1050 • 703.698.9727**
connect.woodburn@verizon.net

March 6, 2018

Xiaomei Ma
869 Orange St Unit 1E
New Haven, CT 06511

Re: 3326 Woodburn Village Dr Unit 12 Annandale, VA 22003 – ACTION REQUIRED

Dear Owner,

The Management Office has received multiple noise complaints regarding your unit at 3326-12. This purpose of this letter is to inform you of a noise violation. Allegedly, "a loud TV, loud music, banging on the floor and screaming and yelling" emanating from the unit. This is a violation of the Association's Rules for noise.

It has also been brought to managements attention of cigarette butts and cigarette packs being thrown on the grown and the patio below. This is a fire hazard and unsanitary. Please do not throw cigarette butts or trash off the balcony.

**Within ten (10) days of receipt of this letter, please take the following corrective action:** Have the residents of your unit and their guests reduce the level of noise coming from your Unit, so that it does not disturb other residents especially during the Association's quiet hours from 11pm through 8am.

Please understand that your attention in this matter is being requested in an effort to keep The Condominiums at Woodburn a peaceful Community for all residents. Further action will follow if additional complaints are reported. If you feel that you have received this letter in error, please notify us immediately. In this way, we may correct the Association's records and pursue the correct party.

Thank you.

138.    Defendants, thought plaintiff, after reading that letter with false allegations full of malice and

that caused a lot of mental distress and emotional hurt in him, know or ought to know that if they receive an

emergency call from a resident, pertaining to a water leak, for example, from a unit above, they could no

conclude, in any way shape or form, without investigating the leak, and without inspecting where it came

from that the only unit responsible for the leak, must be the unit where the disabled tenant lives, assuming

that the disabled tenant, most likely than not, would forget the water running or damage the unit to the point

of causing the leak, as they did here, telling the landlords to stop such alleged acts that they did not know for sure to have taken place, let alone to conclude with no prove that it have to be acts of the disabled tenant.

139.    With not a single factual evidence to back up their accusations, defendants resorted to legal threats against the landlords, ordering the landlords, who lived in the other end of the Continent, in Connecticut, and had no means of verifying the validity of their false accusations, to put a stop, withing10 days, to such alleged acts that they could not even prove to be taking place, while present, 24- hours day, in this complex, and while such acts were allegedly going one for a long as a period of time for them to have some prove and not act based on unproven rumors by some of their anonymous, concerned decent resident.

140.    With these defendants present in this complex day and night having here their security officers here at night, if any of the false allegation raised in that letter full of malice, to trick, induce and force the landlords to get rid of the disabled tenant for them under false pretenses, were true, these defendants would have been able to, at least prove that at least once they tried to correct such alarming situation that could have been so disturbing, especially since such intolerable acts were taking place after the quiet hours in the building, like having, at least knocked once in the plaintiff's door to warn plaintiff to keep down the noise, or having at least once call plaintiff on his phone, whose number was available to them, to alert plaintiff that they were disturbing others in this subdivision, or at least have a pr0ve that they were forced to call the police to calm down the situation with such intolerable acts taking place, all night long, under their nose.

141.    Defendants had never before writing this false letter full of malice, with their underlying ulterior motive to trick others to do their dirty and illegal job for them, under false pretenses, been forced to call the law enforcement to plaintiff's home for help to alleviate such intolerable situation.

142.    That letter speaks of behaviors and conducts that if they were true, would have made, at least one of the grieved residents to call, at least once, their security guard for help to demand a prompt resolution of the problem, while such alleged intolerable actions were taking place, if the residents in this subdivision

are to be assumed that grossly ignorant, as to not know that for such behaviors and conducts they call the Police Department, when such intolerable acts occur and does not let your family get the quiet enjoyment of their home, and not some rental property management and days later.

143.    The reason there is no evidence to substantiate their allegations, the reason no security guard ever went to plaintiff's home, the reason the management never called plaintiff, the reason no police officers were never called to plaintiff's unit, before they wrote that false letter full of malice, with the their underlying ulterior motive, to trick others advance their illegal agenda, to evict a disabled tenant under false pretenses is because nothing in that shameful and disgraceful and illegal discriminatory letter was is true.

144.    Plaintiff, understood, at that moment, that he was not going to have an easy time with these despicable defendants using in such a cowardly manner these heinous, shameful and illegal tactics to induce others, from their position of superiority, to act as their pawns and do their dirty job for them to get rid of the mentally disabled tenant, (stop from taking place what was not proven to take place within 10 days) of face them.

145.    It was for this reason that the defendants were not interested to fix their malfunctioning door, to use the noise of that door as tool to force plaintiff out, under false pretenses (desperate treatment) and to use that door to coerce others to corroborate with hem and help them get rid of a mentally disabled tenant under false pretenses.

146.    Defendants' refusal to repair or replace the malfunctioning door and refusal to make this accommodation, even if all in that complex, has this same defect, which they did not, encouraged and motivated landlords to *constructively evict plaintiff.*

147.    Plaintiff's life and the life of his minor child and the life of his mentally disabled son, as a direct result of these defendants' become unbearable in this subdivision with no proper functioning kitchen, in their home, with no proper functioning toilet, with a door that made their life hell, being blamed day and

night under false pretenses, all designed by these defendants to force plaintiff out "voluntarily" by means of desperate treatment

148.    Against all odds, plaintiff decided to stay, hoping that the desperate treatment, would eventually fade away one day.

149.    Most of the unit owners, in that subdivision were kind and polite to plaintiff and acted respectfully toward plaintiff for the entire time he lived there.

150.    The only resident plaintiff had sensed to have a problem with him was a resident directly below his unit who looked, to plaintiff.

151.    Plaintiff sensed discontent, every time he encountered that person and starred to beehive that perhaps he was the one complaining to the defendants, not happy that he had a disabled tenant as his neighbor.

152.    One morning when plaintiff was walking his kids' dog, (a small friendly pug) this individual stepped out of the sidewalk where he was walking toward plaintiff into to the grass lawn, as if he was afraid or disgusted by dogs and plaintiff tried to pull his dog, from getting closer to sniff him.

153.    But when plaintiff walked away and there was a woman coming toward him with a big German Shepherd dog, that same individual came out of the grass and back to the sidewalk smiling at the woman and complimenting her dog, making it clear, he was not afraid or disgusted by the dogs but wanted to dehumanize plaintiff and show plaintiff that he was not welcomed in that subdivision.

154.    Another morning when plaintiff was walking his dog, this same individual came out of his patio sliding glass door, headed toward his car, while plaintiff's son, Kleot came following plaintiff to ask something but forgetful of what he wanted to ask, turned back and left for home.

155.    Plaintiff tried to talk to his son, asking him what he wanted.

156. That individual, without saying good morning or anything, said to plaintiff "I feel sorry for you but you have to do something about him".

157. Plaintiff sensed, some ill intent on his tone of voice, and walked away, without even acknowledging he heard what that person said and they never spoke again to each other.

158. These two incidents have made plaintiff suspect that if there were any complaints about his family from his neighbors to these defendant's office it would have come from this individual.

159. Most of the other neighbors in the budging although the plaintiff's door was annoying and disturbing to most of them, were friendly and polite and understanding to plaintiff and very helpful, like an old lady next door who always let plaintiff's son in to use her phone to call plaintiff.

160. while refusing the fix that malfunctioning door, defendants never stopped complaining about that door, to the landlords and to their agents.

161. During the entire stay in this complex there has been only one single incidents by plaintiff's minor child Arbin that has never been repeated for which the defendants had a right to complaint about regardless that they blew it out of proportion.

162. Plaintiff's minor child appeared to have thrown once an empty cigarettes box from his window

163. This is true; plaintiff had seen that empty cigarette box outside on the loan, below his window and had confronted his minor son, about it and his minor child, Arbin accepted he did that and understood this to be a mistake, promising plaintiff he would never do this again, and begged plaintiff not to tell to his mother, who lives in Texas, and he was trying to impress that he was a good boy.

164. Defendants had seen this, and had warned the landlords about this and plaintiff found this from an e-mail he received from one of his landlords.



165. Directly after receiving this Cease and Desist e-mail from the landlords, plaintiff brought this up with his minor child again.

166. Feeling guilty for what he had, Arbin asked plaintiff if could write to the landlords, which he did apologizing for his action.



167.    Plaintiff's minor child, disappointed with himself, decided to self-punish himself, including his mother in that e-mail who lives in Texas and who he was trying to show that he was a good boy, trying to help the family with his older brother and not be the give defendants one more excuse to demand they get out of this subdivision.

168.    Arbin learned his lesson and not only was this incident never repeated, but on the contrary, Arbin and his friends; (*Jenn and Yousaria, and their other mutual friends of theirs*), who came to see Arbin, tormented and terrified by the acts and intentions of these defendants, to get rid of plaintiff's family, under false pretenses, would go outside and pick up trash, any time there was any trash in or around the building, especially at the building entrance, where often some young men, with tattoos all over their bodies set, eating their food (usually MacDonald) and smoking cigarettes and littering there, *totally undisturbed by these defendants*, who, as soon as they would go, leaving all the trash behind, had no problem blaming plaintiff's mentally disabled son for this, under false pretenses.

169.    Plaintiff's minor child and his friends had no duty and no obligation to clean this subdivision, and were not doing this, as great kids (*which they are*), but out of fear, terrified and tormented by these defendants' acts to evict a disabled tenant, not to give these defendants another excuse to blame plaintiff's family under false pretenses.

170.    Defendants who were 24 hours present in this building, never appeared to see the ones loitering their building, despite the fact that those young adults were loitering and littering there for hours day after day, leaving behind food trash bags and cigarette butts but were free to assume, every time that the littering should be the act of the mentally disabled tenant, accusing the disabled tenant for it to the landlords, while, at the same time, as extreme and outrageous as it sounds, admitting that they had no prove to back up their accusations but implying to the landlords, through their legal representatives, Broome, & Machado that since the accused one is or appears to be mentally disabled prove of the allegations is not necessary, for the

Page **32** of **64**

landlords to self-help to get rid of their problem, threatening the landlords that if they failed to act they could

have legal repercussion from if they were forced to coerce their residents to corroborate with them and use

their corroboration as substitute for the factual evidence they did not have to self-help.

171.   Even when these defendants, (*their legal representatives*)  were forced to admit, in writing,

that they had no factual evidence to prove their accusations against plaintiff, relaying on the fact that

plaintiff's son was or appeared to be meanly impaired, assuming such is good enough for them to assume the

littering or the loud music, or other noises should be attributed to him, nonetheless they though these legal

representatives demanded that the, landlords should not need any prove to evict a disabled tenant's family

*(cease and desist something that could not be proven to exist).*

172.   With each of their failed attempts to force plaintiff out, by means of desperate treatment and

false accusation, defendants became angrier and more frustrated, more determined and more aggressive to see

plaintiff out of there, at all costs.

173.   Their anger and frustration grew quick into a personal vendetta against plaintiff.

174.   Out of desperation, anger and personal vendetta, against plaintiff, refusing to leave their

subdivision "voluntarily" defendants started to accuse plaintiff's family, with not of shred of evidence to back

up their accusation, with serious crimes, misbehaviors and misconducts.

Dear Unit Owner(s):

This firm represents the Woodburn Village Condominium Unit Owners Association. The purpose of this letter is to advise you of reports the Woodburn Village Condominium Unit Owners Association received regarding the conduct of an occupant of your Unit and to request any corrective action that may be necessary to ensure such conduct does not occur or continue to occur. Such alleged, conduct as more particularly described below, constitutes a violation of the Condominium Instruments, specifically Sections 5.8(a)(3) of the Bylaws.

Specifically, the Association recently received a report from another resident that an occupant of your Unit (alleged to be a juvenile male) appeared upon the Association's playground area and exposed his genitalia to the children playing on the playground. The report also indicates that the juvenile male appears to be smoking marijuana on the Condominium property. The report also indicates that the juvenile male frequently screams (threatening statements) and bangs on doors often between the hours of 1am to 6am. The report indicated that the juvenile was heard yelling that he would 'get a gun and shoot everyone in the building if he wasn't let out of his room'. The reporting resident indicated that the residents of her Unit were suffering psychological and emotional harm as a result of this alleged conduct, including fearing for their personal safety, lack of sleep and being fearful of traversing upon the Common Elements or leaving their Unit when the juvenile is around.

175. Defendants were now harassing and threatening the landlords to evict plaintiff, based on such unproven accusations of serious crimes, claiming through their *legal representatives, Broome, & Machado*, that, supposedly, as a matter of law, they did not have to prove anything, as long as the accused one is proven to be or to appears to be mentally disabled.

176. A mentally disabled person, according to defendant' *legal representatives,* had no right to demand prove for the acts accused of, as long as the defendants could prove that the tenant is or appears to be mentally disabled, warning the landlords that if the landlords do not act, to evict the disabled tenant, (*correct the problem as they put it*) demanding prove, defendants would be forced to produce corroborating reports from their residents to use such corroborating reports, as substitute for the factual evidence they did not have, warning the landlords to do better get rid of the disabled (*stop the alleged crimes that the defendants themselves, who were present 24 hours a day, every single day, in the complex could not prove to be taking place, as alleged, let alone the landlords who resided on the other end of the continent*).



177. Defendants' nonstop harassments and threats to the landlords to get rid of the disabled tenant for them, under false pretenses, without demanding any prove for their allegations, presented as perfectly

legal to do so by defendants' legal representatives, as long as the one to be evicted is or appears to be

mentally disabled, prompted the landlords to demand from plaintiff to move out of their place, as soon as

possible, based on the defendants false accusations that needed not to be proven according to Rees Brome,

PC. As long as they could prove that the accused one was or appears to be mentally disabled

On Friday, August 17, 2018, 2:19:05 PM EDT, Xiaomei Ma
<xiaomei.ma@gmail.com> wrote:

Friday, August 17, 2019

Dear Mr. Gjoka,

Given the repeated violations, please find another place and move out as
soon as possible.

Sincerely,

Xiaomei Ma

178.    These nonstop, malicious and illegal false accusations forced plaintiff in the end, when enough

was enough for him to bear, to react forcefully and angry against all of them, with a tone of voice and curses

against these three defendants and their despicable legal representatives, for which plaintiff is not proud

about, regardless that plaintiff believes wholeheartedly that the defendants and their legal representatives

deserve it.

- **Sami Gjoka** <samigjoka@yahoo.com>

  To:Xiaomei Ma

  Cc:Bill Wang,Woodburn Village
  Condos,kmachado@reesbroome.com,Jerome Friedlander,II Jerome P.
  Friedlanderand 7 more...

  Oct 30, 2018 at 11:17 AM

  I red that letter and tell them, the condo management and their attorney
  that nothing in that letter can make me, my son and my family  move out
  and that those motherfuckers, including their attorney are illegally and in
  violation of the protected rights of individuals with disabilities, making illegal
  threats   with matters that are not even for them to decide and enforce but
  for the police and for the court, trying to make us move out and force
  hardship on us because my son suffers with depression, schizophrenia and
  anxiety but has harmed no one and has never exposed himself as this
  illegal threat kind of notice to vacate alleges,  to those kids or any one and
  this is a cruel lie by the attorney or any vicious unanimous person.

179.     Plaintiff went on stating, in that same e-mail, that enough is enough and that, if this was true,

the parents of those kids, having witnessed such a disgusting crime of turpitude taking place in front of their

kids, would have called the police right way in the spot and not the condo association some time later.

> Enough is enough
>
> If these are true the motherfucker who sow or witnessed this could have
> called the police right way not the condo management and the police would
> have sorted this out
>
> I am tired from this motherfuckers who dare to have the courage and
> intimidate you by violating the federal and state laws of taking advantage of
> a men with disability
>
> and again taking matters of allow enforcement in their hands.
>
> Respectful your tenant
>
> Sami

180.     Furthermore, fed up with these nonstop, false accusations, plaintiff responded to landlords'

warning to move out, based on these three defendant's false accusations of such shameful criminal conduct

that: *"If I sow a 20-year-old man expose his genital to my child, if I knew that he is normal I would kill that*

*motherfucker right away and if I knew that the person was mental, like my son, I would call the police*

*immediately not the association"*, warning them in that letter that time had come for him to sue them for

discrimination in this Federal Court of the Alexandria Division, telling the landlords that the reason he was

not rushing to file his complaint was because he was not sure if he could sue the attorneys and their law firms

for discrimination having used their license to make the discrimination possible.

> This said, I know from your letter you are a kind man and I would have loved to have you as a landlord but
> this said it does not mean I am leaving you out of the law suit, I am filing in the federal court (Alexandria) against
> the association for doing this and for you going along with them.
>     The only reason I am delaying the law suit is to find out from the state bar if attorneys and legal firms
> have any legal protection for using their state issued license to practice law to inflict hardship with no grounds
> to do so to the opposing party for the benefit of their clients hoping they can intimidate you even when they know
> that threats and intimidation are false, and done to the most vulnerable people like the case to my son that
> suffers exactly from this being afraid that people are hunting him for things he has not even done but is being
> accused of.

181. Plaintiff alerted his landlords not to rush and try to evict him under false pretenses since there was no truth on any of their false allegations and alerted the landlords that defendants with their despicable legal representatives were tricking them to violate the law for them and do their dirty job for them.



**Urgent - Notice of Law suite in Fed Court (Alexandria)**

Sami Gjoka <samigjoka@yahoo.com>
To: xiaomei.ma@gmail.com <xiaomei.ma@gmail.com>,
Thomas Davenport Jr <tdavenportjr@davenportfirm.com>,
Amber Buckhalter <secretary@davenportfirm.com>,
Bill Wang <b.wang168@gmail.com>,
Woodburn Village Condos <connect.woodburn@verizon.net> more..

samigjoka@yahoo../Sent
Nov 1, 2018 at 2:56 PM
Print  Raw message

October 31, 2018

Dear Xiaomei Ma

I received your letter (e-mail) asking me to move out of your unit and you are wrong to do that.

I am sure you made this hasty and wrong decisions due to the duress from the association.
    Their attorney send you a letter, forcing you to do their dirty job for them, evict a person with mental disability from their building, a person that has done none of those things they allege, based on some anonymous complaints that they themselves hint even that they are not sure if those alleged

182. The landlords however, had had much more than they could bear, themselves, from these despicable defendants, and their law firm, harassing and threatening them nonstop to get rid of the disabled tenant, based on their false accusations, without requiring any prove for their accusations and since such threats on behalf of the landlords were coming from a law firm and an attorney, the landlords had reason to believe them or get bullied and intimidated by them to do their dirty job for them and demand nothing from plaintiff but to get out of their homes from where the landlords had constructively evicted plaintiff since the beginning of the lease, forced and induced and encouraged and motivated to do so by these three defendants.

- **Xiaomei Ma** <xiaomei.ma@gmail.com>

  To:Sami Gjoka

  Oct 31, 2018 at 3.06 AM

  October 31, 2018

  Dear Mr. Sami Gjoka (also known as William Whitman),

  As concerns about noise from your unit have been raised multiple times, I would like to request your attention to Page 81 of the attached file, which includes Condo Bylaws and Declaration.

  In addition, I am attaching the lease we signed in February 2018. Item #9 states that Tenant "shall comply with all applicable laws, ordinances and rules and regulations of Landlord and the Association (as hereinafter defined). Lease may be terminated at the option of Landlord in case of any nuisance, excessive noise, disturbance or conduct that, in the opinion of Landlord, is offensive to any other tenant or occupant of the building or neighborhood."

  Please move out of the unit as soon as possible.

  Sincerely,

  Xiaomei Ma

183.   When even this did not produce the expected result for them, defendants made good on their threats to coerce the residents to corroborate with hem and complaint absent plaintiff, instructed and mentored to do so by their legal representatives, Broome, & Machado, to use those complaints and their corroboration to evict the disabled tenant.

184.   Tricking, inducing and forcing a few residents to corroborate with them and complaint against plaintiff was not an impossible task in the mind of these defendants.

185.   Defendants, instructed by their despicable legal representatives, *Broome and Machado,* how to trick, induce and force their residents, to corroborate with them to get rid of the mentally disabled tenant, under false pretenses, engaged in a fishing expedition to see if there was any owner resident willing to help them get rid of mentally disabled tenant from their building to make their subdivision a more decent place to live.

**The Condominiums at Woodburn**
Woodburn Village Unit Owners Association
3380 Woodburn Road, Annandale, VA 22003
703-698-1050
info@condosatwoodburn.com

## NOISE COMPLAINT

**All Residents of 3326**

The Management office has received complaints regarding people screaming and arguing in their units, loud music/TV and loud noises in the building. As we all know, our building shares its walls with 14 different families and we all must be mindful of everyone who lives in it.

Reminder, quiet hours are 11:00 pm – 8:00 am. Please extend courtesy to your neighbors and try to keep the volume to a minimum.

If you have any question, please contact the office at 703-698-1050. Thank you in advance for your cooperation.

186.     Defendants started to deliver fliers to the residents, alerting the residents that there were intolerable activities going on, misconduct and misbehaviors, fighting and screaming and yelling and banging on the walls and loud music during the quiet hours in their building that would not let them but they perhaps did not know because they could be asleep, when all this was happening, but the defendants, who did not live in the building knew it and wanted to rectify this problem for them and get rid of this for them, although they maybe and no idea of what was going on let alone to have been disturbed by such alleged acts, but since this was for the good of the complex, perhaps they should trust them and call them to learn how they could help.

187.     This fishing expedition in search of any likeminded resident, who could help them get rid of a mentally disabled tenant, under false pretenses, is exactly what these three defendants' legal representatives, Broome, & Machado, had warned the landlords would do if they failed to evict plaintiff, demanding proof before acting based on their allegations.

188.     Defendants, could not have had any hard time, if the allegations were not fabricated lies, to find a few residents in the building, to corroborate with them, especially with the unusual loud noise of the

defective door that the defends refused to fix for the entire year, while, as extreme and outrageous, as it sounds, complain nonstop about the nose of that door, and yet they found none to corroborate and complaint except the same one or two residents who more likely than not were the same residents who had been complaining all the time under false pretenses, unhappy that they had to share the same building with a mentally disabled person.





189.    For any reasonable person, the normal course of action, if the allegations raised in that flyer were true, would have been for the residents seeking help from the management and not all the way around.

190.     When this, too, failed to yield them the desired results, defendants; (*again advised and instructed by these despicable legal representatives Broome & Machado who were using their licenses, as a vehicle to make discrimination possible, in the housing rental industry*), escalated their heinous, and illegal campaign against plaintiff, to force plaintiff out by instructing any interested resident, willing to help get rid of the disable tenant, to engage in malicious prosecution against plaintiff.

191.     Defendants; (*encouraged to and instructed how by Broome & Machado*), tricked and induced, encouraged and motivated some of their interested residents, that might be very well the only and the same 1 or 2 residents who had been complaining all along and who could be the sole authors of those false 2 letters of Nov 2, although they look to be written by the same person, on the same computer, suing the same font and same printer, to call the Police Department to the plaintiff's home, under false pretenses, many a times, in the middle of the night, when plaintiff's kids were sleeping, to torment and terrorize them, with police raids, in the middle of the night, for nothing wrong but to force plaintiff out as the only way to safe his kids form such torture and torment and misery he plaintiff was putting them through, by keeping them in a subdivision where they did not belong.

192.     Defendants' malicious prosecution acts would have inflicted extreme mental distress, and emotion pain and suffering to any normal person, let alone to a mentally disabled tenant and a minor child, wo was falling in severe clinical depression, the way the lived and the way they were treated by these in this subdivision.

193.     Defendants; as well as their legal representatives, *Broome & Machado* had actual knowledge that plaintiff's older son Kleot was suffering from a mental disease of severe depression, anxiety and PSTD, with signs of schizophrenia that makes a person live in a constant fear that the world is out there to get you for things you have not done and these defendants, encouraged and motivated to do so by these despicable legal representatives, Broome &. Machado, did exactly that; inflict the acutest pain possible to the most

vulnerable person to, intentionally, deliberately and repeatedly terrorize an already terrorized family, till they were forced out of their subdivision on their own and voluntarily.

194.    Defendants' malicious prosecution with police raids in plaintiff's home have every single time terminated in plaintiff's favor.

195.    Defendants' heinous acts, to violate the law, to terrorize and torment, the most vulnerable ones, with no legal or factual basis to do so expect their ulterior motives, per direct instructions of these despicable legal representatives, Broome, & Machado, were deviously designed to vilify and defame, plaintiff,' in the eyes of others, as if something terribly wrong and illegal was going on in plaintiff's home when nothing was, to build a hostile environment, for plaintiff in this subdivision, under false pretenses.

Plaintiff requests that this Hon. Court take *Judicial Notice* of the *Adjudicative Fact* that these defendants had actual knowledge that the plaintiff's older son, Kleot, is mentally disabled, describing him in detail, in their threatening and deceiving letters to the landlords, as someone who is or is regarded to be mentally impairment, *(see Americans with Disabilities Act)*, depicting his appearance and "behaviors" as schizophrenic that makes a person live in a constant fear that the world is out there to get you for things you have not done but are accused of, under false pretenses, and these defendants, instructed and mentored by their legal representatives *Broome and Machado*, did exactly that, adding insult to the injury, initiating police raid in the plaintiffs home under false pretenses, in the middle night to inflict severe and cruel and inhumane mental and emotional distress to already a mentally and emotionally distressed mentally disabled tenant, to force him and his family out of this subdivision.

196.    The other residents who did not fall into these defendants' trap to corroborate with them and compliant against plaintiff, under false pretenses, would have had no way of finding out that the police "raids' in middle of the night to the plaintiff's home, were acts of maliciously prosecution designed by Broome, & Machado, and carried out by these defendants.

197.    These actions motivated by malice were designed to make the life of plaintiff's family unbearable and force them out of this place "voluntarily" as the only way to escape the misery and torment they had to endure here if they refused to leave on their own.

198.    Every time the police came to plaintiff' home, waking his kids, in the middle of the night, the police, with permission from plaintiff, had to thoroughly search plaintiff's home, with his kids terrified, out of their beds, trembling and against the walls, finding nothing illegal or wrong or illegal, in the plaintiff's home, as defendants and their legal representatives kept accusing plaintiff to the landlords and their agents.

199.    The police officers, had to admit, in the end, telling plaintiff that it appeared that they were being called there to his home by someone with ill intent who spoke bad English or who pretended to speak English with accent.

200.    The police officers even said to plaintiff in one of their "raids" that since they were called there, many times, for alleged fighting, and drugs, and scramming and yelling and they found nothing every single time they came, they had to wait in their vain, outside, below the plaintiff's balcony (*plaintiff lived on the second floor, very close to the ground*) and in the hallway, behind plaintiff's door, to see if anyone would be fighting or screaming or banging or for any sing of drug use inside plaintiff's unit, as the caller(s) claimed every single time and they never found anything and yet,

201.    Even after that, even after each of their malicious prosecutions terminated in plaintiff's favor, defendants encouraged and motivated to do so by greed by these despicable legal representatives, Broome & Machado, not only did not stop their harassments and threats to the landlords, but enraged even more by the fact that their malicious prosecution too failed to force plaintiff out "voluntarily",  declared to the landlords that "the police were of no help" (*accusing even the Police Department, now, with crimes of concealing crimes*)  and that they needed take matters in their hands, "SELF-HELP".

Such promise was short-lived as on August 10, 2018, Landlord received a complaint of screaming, yelling and banging and beating of the walls during late night hours. The noise was so severe that the police had to be called on several occasions to handle the situation.

Since then there have been several more complaints and notices sent to Landlord regarding the violations and actions of Tenants (see Exhibit C). Even though the police were contacted, they could not to anything to alleviate the situation.

ACCORDINGLY, FOR THE REASONS STATED ABOVE, YOU ARE HEREBEY NOTIFIED THAT YOUR LEASE WILL TERMINATE 30 DAYS FROM THE DATE OF RECEIPT BY YOU OF THIS NOTICE.

If You fail to vacate within 30 days from service of this notice upon you, then You will be subject to a suit for eviction and be held responsible for all costs and damages incurred by landlord by reason of your breach and failure to vacate, including reasonable attorney's fees

202.    Plaintiff, asks the Court to take *Judicial Notice* of the *Adjudicative Fact* that each and every of these defendants' *Malicious Prosecutions*, have every single time, terminated in plaintiff's favor but not before causing unimaginable pain and suffering and psychiatric scars to plaintiff's vulnerable kids, the dire consequences of which, plaintiff and his kids continue to suffer to this day.

203.    These malicious actions were not only driving plaintiff's mentally disables son, Kleot, into more mental distress but it was taking a heavy toll and having a terrible impact on plaintiff's minor child, Arbin, as well.

204.    Arbin, tried to put an end to his life as the only option to escape such unbearable nonstop torments, many times, by cutting himself to bleed to death, saved and was kept alive two three times by the Intensive Unit Care Department in the INOVA Hospital.

205.    Each time in his unconscious state of mind, while in delirium Arbin has declared to the social workers in the hospital and to those from the Mayfield Mental Health Center, who got evolved in his case and to the doctors, and therapists to the Timber Ridge School where he was send for treatment, that the reason he wanted to kill himself was because life had become unbearable for him with both the condition in the unit and

the treatment from the condo management, bringing the police to their home for nothing they had done wron

and there was nothing to stop this pain if lived.

206.    Plaintiff's kids, Kleot and Arbin were just like any other kid their age, with dreams and hope

and desires for a better life, deprived here the most basic things a tenant is entitled to (a livable home) despi

the fact that plaintiff had paid for such a livable home, in full and in advance for the entire year.



207. Trying to escape the state of such terror and the fear, inflicted on him by these cruel and inhumane, entities, plaintiff's minor child, Arbin, while cutting himself to bleed to death, was at the same time, crying out loud to the entire world for help, feeling he was tormented in this place, day in and day out, to the point he no longer could bear it anymore, posting words, carved with razor blades in his flesh "save me" and posting those pictures on line, hoping that someone, somewhere, will see them and rush to help.



208.    While in delirium and in unconscious state of mind, each time, plaintiff's minor child, Arbin has declared, to the social workers in the hospital (*INOVA Hospital Intensive Care Unit*) where he was saved at different times and to the social workers at the *Mayfield Mental Health Clinic* who got evolved to treat him and to the doctors, and therapists at the *Timber Ridge School* where he was send for treatment, that the reason he wanted to kill himself was because life had become unbearable for in his home, blamed for letting his older brother pace in and out, of their home, because the defendants were using the door noise to evict them and blamed for keeping his brother inside, for driving him into acute crises, because of his intense need to pace in and out, symptoms of his disease.

209.    Abin's physical and psychological scars and wounds, might or might not improve, as life goes on, depending on what life holds ahead for them but one thing that appears sadly sure is the fact that plaintiff's kids with all the trauma they received by these d, defendants to get rid of them under false pretenses, will never heal entirely and plaintiff will have to struggle with this, for as long as he lives, trying to be there for his kids.

210.    Fed up by all this desperate treatment, malicious prosecution, deliberate and intentional misrepresentation of the material facts that generated their nonstop complaints, about plaintiff's unusually loud defective door, plaintiff when plaintiff could not handle this anymore, knocked on or about 11-5-2018 in his neighbors' door and asked her to allow him to record her door closing and his door, for comparison, because he wanted to prove, that his family was, purposefully accused for things they had not done by defendants.

211.    Plaintiff told her that he was going to use that recording for his discriminatory legal actions.

212.    With her permission, plaintiff recorded both the doors and in order not to lose them posted the recordings on YouTube.



213.    Only when plaintiff warned these defendants that he had recorded the videos of the

malfunctioning door, to use these videos as evidence in anticipated legal actions against them and warned

them that if they did not stop their false accusations and if they refused any longer to fix the door, he was

going to sue them, only then were the defendants forced to send someone, to inspect the problem, claiming

under false pretenses, that they had no clue, till that moment that the door was defective.

214.    Directly after inspecting (*pretending to inspect their material object that they knew very well

to be defective*) defendants tried to fix the door with their contractor and admitted that even with their work

the door still was malfunctioning directing the landlords to fix it, something they had refused categorically t

do for the entire year, till they were threatened with a lawsuit from plaintiff.



**Sara Pagani** <SPagani@cmc-management.com>
To: connect.woodburn@verizon.net, xiaomei.ma@gmail.com
Cc: samigjoka@yahoo.com


Nov 9, 2018 at 1:45 PM ★

Dear All,

Sami, maintenance went to your unit on Tuesday as scheduled. A woman was home and present with your son. She opened the door for the maintenance techs.

They were able to put weather stripping around the door. However the best remedy would be to install a door closer on the inside of the home. We are not able to provide that service.

Xiaomei, you will need to contact a contractor for that.

I will send the ticket as well as picture of the doors showing in fact we were there in a second email.

Also, as mentioned the woman who was home opened the door on Tuesday and witnessed them working.

**Sara Pagani, CMCA®, AMS®**

General Manager

The Condominiums at Woodburn

Community Management Corporation, an Associa Company



*Delivering unsurpassed management and lifestyle services to communities worldwide.*

3380 Woodburn Road

Annandale, VA 22003

O: 703-698-1050

F: 703-698-9727

Visit us online: www.cmc-management.com

---

3326-12                                                                                          Yahoo/Inbox



**Sara Pagani** <SPagani@cmc-management.com>                                Nov 9, 2018 at 1:43 PM
To: connect.woodburn@verizon.net, xiaomei.ma@gmail.com, samigjoka@yahoo.com

Please see below 3 pictures to included the completed work order as well as two photos of the front door of the unit.

As previously stated the owner will need to hire a contractor to further access the condition of the door and possibly a door closer unit that would be installed on the door on the unit side.

**Sara Pagani, CMCA®, AMS®**

General Manager

The Condominiums at Woodburn

**Community Management Corporation, an Associa Company**



215.    It is an undisputed fact that, as soon as the door was repaired, there has never been a single complaint made against plaintiff and his family, making it clear for the Court and for the Jury that these three defendants; ASSOCIA, CMC, The Association, together with their legal representative, Broome and Machado, who are the one who orchestrated everything, wrongfully, maliciously, intentionally, deliberately and repeatedly been accusing plaintiff and his family, under false pretense for the entire year, for their shameful and illegal ulterior motive, for acts that never took place, to intentionally and deliberately inflict mental distress and emotional, pain and suffering and sever, psychologically and physical injury to plaintiff's family, to force them out of their subdivision and to force the other residents in the same building to complaint and to corroborate with them to get rid of the disabled tenant under false pretenses and plaintiff asks this Hon. Court take *Judiciary Notice* of this *Adjudicative Fact* that after the door was fixed not one single complaint has ever been raised against plaintiff's family.

216.    It is a fact that these defendants have admitted in writing that they never claimed that their allegations were true, and that that they had supposedly always declared that they had no factual evidence to back up their allegations, and yet threatening the landlords and their agents to act based on their unproven allegations, since the accused one, is or appears be mentally disabled, making the proof of the allegations, as a matter of law, according to them and according to their legal representatives, *Broome & Machado* irrelevant, and plaintiff requests that this Hon. Court take *Judicial Notice* of the *Adjudicative Fact*.

217.    It is a fact that these defendants were informed of both the defective door they refused to repair and about plaintiff mental disability since the very first weeks of the lease, regardless that with the help of these despicable legal representatives, who were using their licensees to practice law in Virginia, as a vehicle to violate the very law they are entrusted to uphold and plaintiff requests that this Hon. Court take *Judicial Notice* of the *Adjudicative Fact*.

218.    While these defendants, were forced, in the end, threatened with a lawsuit to act and make sure their defective door that they refused to fix was fixed right away, as despicable, extreme and outrageous as it sound, retaliated against plaintiff, to show plaintiff that they still were in a superior position to make his life a hell if he decided stay in that subdivision , towing his car, under false pretenses, that the parking permit had all of a sudden expired, towing his car from the same assigned parking lot, assigned to his unit and no one else, where he had parked undisturbed till the very first day they were forced to accept that they and for the entire year so heinously and viciously and illegally discriminated and tormented him and his family and plaintiff requests that this Hon. Court take *Judicial Notice* of the *Adjudicative Fact*.

219.    When plaintiff brought the car back to his parking lot, and went to demand a temporary parking permit from the security guard, that these defendants provide to even guests of the residents, the security guard opened a log book, and after reading on some think, told plaintiff that  he cannot give him a parking pass.

220.    Plaintiff requests that this Hon. Court take *Judicial Notice* of the *Adjudicative Fact* that directly after these defendants were forced to make sure making sure that their defective door that they refused to fix for the entire year was fixed, not only these defendants by towing his car and  towing on weekend when they are closed and told the security desk not to give plaintiff a temporary permit that they give even to guests but in concert with them the landlords and their agents their retaliated in days, against plaintiff, with their 30 DAY NOTICE TO VACATE on Nov, 13, 2018.



F&M **Fox & Moghul**
**Attorneys at Law**

VA, DC, CA & NY
8230 Boone Blvd., Suite 210 • Vienna, VA 22182
Phone: 703-652-5504, Fax: 866-451-9531
Website: www.moghullaw.com, Email: admin@moghullaw.com

November 13, 2018

**THIRTY (30) DAY NOTICE TO QUIT FOR NON-REMEDIABLE MATERIAL BREACH OF THE RESIDENTIAL LEASE**

**Via Private Process Server and Certified Mail**

William Whitman (a/k/a Sami Giolai)

221. Even after fixing the defective door that they had refused to fix for the entire year to use it as pretext to evict plaintiff under false pretenses, and even after there was no more any alleged complaint about any noise, against plaintiff once the door was fixed, defendants did not stop their vicious and inhumane discriminatory actions against plaintiff but on the contrary, they increased and intensified their acts to get rid of the disabled tenant, from their complex, at all costs.

222. The landlords initiated their frivolous legal actions, to evict plaintiff, with no probable cause,, believing these defendants had all the backing materials for them to state a claim for relief, and believing they were on their right to do so, based on the fact that it was the legal representatives who had made it clear to them that landlords could act based on the allegations alone to evict a disabled tenant on their behalf and that the defendants would provide such corroborating materials for them to state a cause of action against plaintiff, but when time came for the landlords to demand the factual avidness to support their claim, even subpoena from the court, these defendants refused to produce such supporting materials, declaring they had no material facts to support any eviction process on their part, having again inflicted in plaintiff's family such unimaginable mental and emotional pain and suffering, for refusing to relocate someplace else.

223.    While the action to evict plaintiff, were pending, to make sure plaintiff was forced to move out, even if the Court did not evict him, defendants, engaged, dehumanizing, discriminatory and illegal acts against plaintiff , entering plaintiffs home, as they pleased, without any prior notice and with no probable cause to bully, intimidate, harass and threaten plaintiff that this was not a place for him and his family and that he better pack his stuff and get the f… out of this subdivision or stay and be treated worst than a stray dog.

224.    While plaintiff was forced to fight the illegal eviction in the Fairfax County Court, not because he cared anymore to live in this subdivision but not to have an eviction in his record and not to jeopardize his Maryland real Estate Likens, (*Maryland runs a credit check of all the licensees every two years before renewing their licenses*) , and while he had to care not only for his mentally disabled son but for his minor child , now as well, that had developed severe clinical depression,  and social anxiety the way he was treated and torment here by these despicable and inhumane defendants and wanted to end up his life,  seeing himself as burden and feeling guilty as if he had done something wrong for his family to go through all this, and while having to care for his dog that went blind and got terribly sick, exactly in the worst time for plaintiff, requiring  plaintiff to come from work three-four times a day to check no only on his kids but to check on his dog till Arbin's best friend's father came and took the dog from plaintiff to care for his dying dog and give plaintiff a little bit of more time to care for his kids, and to make sure the poor animal was not tormented in plaintiffs home with no adequate attention, and while plaintiff had to care for his business that was going downhill because of all the mental distress and pain and suffering inflicted on him by these defendants, plaintiff was now forced to deal with these defendants inhuman acts to bully plaintiff, intimidate plaintiff, degrade plaintiff and vilify plaintiff and victimize plaintiff  and his family engaging in acts of *illegal entry*, as they pleased in the plaintiffs home with no prior notice and under false pretense of emergencies when no emergency of any kind did in fact exist.

225.     Plaintiff requests that this Hon. Court take *Judicial Notice* of the *Adjudicative Fact* that both of the landlords frivolous action to evict plaintiff under false pretenses, based on the allegations of these three despicable defendants have terminated in plaintiff's favor in Circuit Court, but not before having tremendously harmed plaintiff and forever having damaged his family and for which both plaintiff and his kids would have to suffer in this world for as long as they live.

225.     While all this was going on, with the help and support of the Fairfax County Department, Social workers and Mental health professionals (Mayfield) seeing the emergency to act to save their lifers, , as hard as it is to find the founds, they moved mountains and got the funds to pay for the stabilizations of plaintiffs kids and placed plaintiff's minor child, Arbin, in the Timber Ridge School somewhere in Berkley Spring, VA and his mentally disabled son, Kleot in a mental facility here in Fairfax, and plaintiff was baying them every single day, Christmas gifts, that he could not afford and more than he had bought for them for their entire lives, happy that they perhaps were being saved and to encourage them to remain in the treatment facility, placing those gifts as they arrived from UPS on their beds, where instead of them it was plaintiff now crying for them happy and sad every night, all of the packages vanished the exact day these defendants send their handy man to plaintiff's home, to find out of plaintiff had fled their subdivision or if he was still living there, having not seen his kids around and having not seen plaintiff walk his dog, like he used to, under false pretenses of an emergency when no such emergency was present.

227.     When plaintiff called these defendants, about this, plaintiff explained that all the gifts he had bought for his sons, and that were in their respective beds had disappeared, and asked them to find out if any resident in that subdivision had complaint of messing things after they had sent in their homes the same individuals who were sent to his home that day.

228.     Defendants told plaintiff that if he had noticed musing things in his home he should call the police department, while plaintiff was simply putting them in notice to be careful of that individual because

his things all went missing, having a duty of care, and be cautious, if such individual or individuals, were to be sent to unattended homes in that subdivision.

229.    Plaintiff was sure that no Police Department would help him recover his stuff  and decided to live with this terribly hurtful incident, believing that no one in his rightful mind would dare send the same person(s) in plaintiff's unattended home, again, with no probable cause and with no prior notice, entering, as they pleased, in plaintiff's home, as if plaintiff was not entailed to any rights decency and privacy in this subdivision but  be treated like a stray dog.

230.    On the morning of March 3-14-2019, when plaintiff came out of the unit to go to work, while the action to evict him, that the landlords has initiated, based on these defendants' false allegations was pending in the Fairfax County Circuit,  plaintiff saw in front of his door a person who looked to be an employ of these defendants having keys on his hands and ready to opened plaintiff's door with a group of woman talking to him that stopped conversing, as if something shocked them as soon as plaintiff came out of that door.

231.    Plaintiff did not like this and was angered and insulted but at the same time was scared to make a scene in front of those woman, who plaintiff believed were taking about him and his family and defiantly they would have to mock plaintiff if plaintiff started wining why was that man at his door,  and furthermore plaintiff  would achieve nothing if he started to quarrel with him why he was trying to get in to his place, which very well he could deny, he was.

232.    Plaintiff assumed him to be a handyman of these defendants but in no way shape or form would the defendants, have dared to send to his unattended home, aging the same individual who after his visit to plaintiff's home all the plaintiffs kids' Christmas gifts had vanished.

233.    Plaintiff got out of the glass entrance door without saying a word to them and decided to pretend to drive to work and turn immediately back to see if that person had entered into his home.

.   234.   While plaintiff turned back and came to his parking spot in front of his building, plaintiff received a phone call, on his cell, from the defendants' office, telling plaintiff that their technician was send to his unit because of a leak emergency.

235.   If it so, plaintiff asked the defendants, why then didn't he tell me so when I could have let him in while I was there.

236.   Plaintiff asked that same gentleman was at his door, and when plaintiff told him: "Why didn't you tell me you were going to enter my unit when you sow me come out of that door?

237.   These defendants' scout, who had come there for other ulterior motives not for any leak for no leak was that day in the building, let alone for a leak to be of such an emergency that they needed to enter his home with no notice and still have take their sweet little time as if nothing urgent was going on, replied that: " this unit is supposed to be vacant" and then added; " the tenants are supposed to have been evicted".

238.   "I am the tenant". plaintiff said to him, "and you sow me come out of that door" and then asked him; "who told you that we have been evicted?"

239.   "People talk" responded the handyman.

240.   "Which people" plaintiff asked him.

241.   "People in the office" said the handyman, " they talk that you have been evicted".

242.   Plaintiff asked his name.

243.   "My name is Kamilio He" said the handyman.

244.   Once inside this Kamilo He said to plaintiff that he does not need plaintiff's permission to open the door but the reason he did not get in is because plaintiff had accused him of stealing the day before and plaintiff learned at that moment, that the defendants had sent the same person who in plaintiff's mind stole all his kids Christmas gifts and the defendants were warned about this and yet did not give a damn about their

duty of care to, at least, have another person accompanying him, while entering the same unattended home within a few days of the alleged robbery.

245. Plaintiff stayed in the unit not to protect any personal property of his, because plaintiff knew they could get in any time but to prove that there was no leak of any kind and that the defendants were simp engaged in such illegal entry to his property and without prior notice as required by law and they know it regardless that they don't give a damn about any law, to bully, harass, victimize, dehumanize and vilify plaintiff till he and his mentally disabled son was forced out.

246. The handyman, pretended to unscrew something to justify their algal entry, under false pretenses and as if he was searching for a leak, a leak that was urgent to enter his hiome with no prior notice but that wasn't visible anywhere.



247.    When the handyman left, finding no leak to justify their  illegal entry to plaintiff's home,

plaintiff went to work and wrote to the landlords' property managing agent, coping in that e-mail the

landlords and these three defendants and the landlords' legal counsel, who was trying to evict plaintiff, based

on these  defendants' false allegations about the allegation of the leak, and about the slandering gossips that

these three defendants, were spreading that plaintiff was allegedly evicted.



248.    These despicable three defendants proving as they had always done, against plaintiff, under

false pretenses to torment and terrify and dehumanize and vilify plaintiff's family under false pretenses, for

nothing plaintiff or his family had done wrong but simply  to get rid of a mentally disabled tenant, wrote back

to plaintiff almost a week later *(March 18, 2019)* claiming almost a weak alter that they still had no located

leak that allegedly was of such urgent nature for them to enter his property with no prior notice, as required

by law, but was not even located almost a week later that, to any reusable person, would mean that by that

time the entire Fairfax County ought to have been flooded and not the unit directly underneath plaintiff's unit

if there was any bit of truth behind their illegal acts.



follow up regarding water leak                                                                      Yahoo/Inbox

**connect.woodburn@verizon.net** <connect.woodburn@verizon.net>                    Mar 18 at 11:44 AM
To: 'Sami Gjoka'

Dear Sami,

The purpose of this email is to follow-up to an entry made into your Unit on March 14, 2019, in response to a water intrusion event that was reported in the Unit immediately below yours.

As you know, the Association's maintenance staff entered your Unit and verified that there did not appear to be any active flow of water originating from your Unit or its related components. That being said the source of the water intrusion event in the Unit below you was not definitively isolated.

3-18-2019 Regarding Water Leak.png

Thank you for your cooperation in permitting access to avoid further water intrusion to the building. If there is any follow-up required related to your Unit, you will receive communications from this office and the owner of the Unit will be copied on such communications.

As you know, the Association's maintenance staff entered your Unit and verified that there did not appear to be any active flow of water originating from your Unit or its related components. That being said the source of the water intrusion event in the Unit below you was not definitively isolated.

249.    Defendants' *3, 18, 2019* e-mail to plaintiff, telling plaintiff that they still (*almost a week later*)

had not located that urgent leak, that prompted them to enter his home without any prior notice, as required

by law, under false pretense of emergency, indicates once more that these defendants had used and were

continuing to use, as pretexts to engage in illegal acts of harassing and threatening and dehumanizing and

vilifying plaintiff's family under false pretenses, alleged false complaint from the same individual, who lived

directly underneath plaintiff, and who was the only one plaintiff had suspected to be behind all these coward

and malicious lies, because most of the other residents in that building were friendly and polite and

compassionate to plaintiff, despite the fact that these defendants, mentored and instructed by their legal representatives, tried to induce on them a sense of hostility against plaintiff, to trick and force them, to act as their pawns and complaint against plaintiff, to get rid of a mentally disabled tenant under false pretenses.

250.    The neighbor, directly across plaintiff's unit, for example, who was an old woman, and appeared to be living by herself, and who could be the last person to help if plaintiff's son presented and remote threat to others, always let plaintiff's mentally disabled son in her home to use her phone to call plaintiff , whenever he needed to and plaintiff was at work.

251.    Defendants eventually managed to break down plaintiff and force plaintiff out, "sinister chamber of terror", for his kids.

252.    Plaintiff  no longer lives in this subdivision and no longer has any connections with these defendants but he and his kids will have to endure for their entire life the pain and the suffering inflicted in them by these defendants to force them out.

253.    Plaintiff moved out of this subdivision, on his own (*not by the seal of the court*), while he was still fighting the eviction not because he wanted to live there anymore but because he had  done nothing wrong to deserve an eviction, and did not want an eviction in his record, plus that the eviction could jeopardize his Maryland Real Estate lines. (*Maryland Real estate Commission runs a credit check of its licenses before renewing their licenses every two years*).

254.    The eviction case, brought against plaintiff for ulterior motives and with no probable cause terminated in plaintiffs favor in the Fairfax County Court but after plaintiff had already left this subdivision on his own and after too much irreparable harm was already done to him and his family, as the direct result of these three defendants.

255.    Plaintiff no longer lives there but the pain and suffering the torment and terror he and his family have endured at the hands of these three entities, will forever hunt plaintiff, wherever he goes, especially with the fact that any time plaintiffs younger child, Arbin, slides back into memories and goes back to those unbearable painful time for him, when they lived here, the vivid memories of "police raids", in their home, in the middle of the night, for nothing they had done, bring him back to square one, while trying to recover and heal from the social anxiety, PSTD, and severe depression instigated in him by these cruel entities, while they lived here, simply because his older brother's mental disability made them uncomfortable and unhappy  to safe himself from pain and misery, he sees no other path than just terminate himself.

256.    Plaintiff sued the landlords and their law firm, in the Fairfax County Court for having abused the process and instituted two eviction cases against plaintiff, both under false pretenses and both with no probable cause and both with underlying ulterior motive to get rid of a disabled tenant based on these three defendants unproven allegations and that both terminated in  plaintiff 's favor.

257.    Plaintiff's younger son,  Arbin overheard plaintiff talk to his mother (*plaintiff's ex*) about the case (*an upcoming demurrer hearing*) and overheard his mother tell plaintiff to let it go, for it will be waste of time and impossible to win against and attorney, even if he was right, while plaintiff told her that he can't let it go and that it hurts him more, if they go unpunished for what they had done to him and their kids.

258.    Arbin came to plaintiff, while plaintiff was dead tired and falling asleep in the sofa the living room and he apologies as if he was the one to blame for all their family had gone through in that subdivision.

259.    Plaintiff understood he was sad and in pain, but he had no energy to talk and comfort his son, telling him his son that he had done nothing wrong, except that childish thing of throwing a cigarette box once that he never repeated again, and telling his son can we please talk tomorrow and he fall dead asleep only to be waken, at two o clock, at night by the Fairfax County Police, informing him that his son was in an involved in a car accident but was alive and that they were taking him to  a mental facility because it was

clear to them he wanted to kill himself but since he was wounded they said they will take him to the emergency room first.

260.    The police officers told plaintiff in the emergency room and testified for the judge on a heari[ng] held to admit him in a mental health hospital (*Dominion Hospital*) that he was trying to kill himself, detailin[g] the events as;  having stopped by their car, to draw their attention, and then fled to crash the car while appearing to want them to stop him and save him but he went straight to a pole and crushed there totaling hi[s] car but not succeeding in  killing himself.



**Urgent Attention - Case No. GV 1901-3590-00 Regarding the Demurrer Hearing**    samigjoka@yahoo.../Sent

**Sami Gjoka** <samigjoka@yahoo.com>    Dec 13, 2019 at 3:35 AM
To: GDC Admin Mail <gdcmail@fairfaxcounty.gov>, Faisal Moghul <moghul@moghullaw.com>,    Print  Raw message
Fox & Moghul Admin <admin@moghullaw.com>, Stella Villalobos <stella@moghullaw.com>,
Rose Nguyen <rose@moghullaw.com> more...
Cc: Bill Wang <bwang168@gmail.com>, Xiaomei Ma <xiaomei.ma@gmail.com>
Bcc: Kathleen N. Machado <kmachado@reesbroome.com>,
Woodburn Village Condos <connect.woodburn@verizon.net>,
Condosatwoodburn Info <info@condosatwoodburn.com>,
Sara Pagani <spagani@cmc-management.com>

**To:**       The GENERAL DISTRICT COURT FOR THE  COUNTY OF  FAIRFAX
**From;**     Whilliam Whittman (Plaintiff)
**Regarding;** The Demurrer Hearing of Monday, Dec. 16, 2019

    **Dear clerk(s) of the court!**
    **Due to an unforeseen emergency, I am confronted with, I beg the Court, and the other party to agree and consent to a continuance of this (demurer) hearing at a later time other then 9:30 AM or at another date as it can please the court and as it can be convenient to the other party.**

    **My son, Arbin Whittman (a minor child) tried to kill himself yesterday Dec. 12th, around 2- or 3 AM and has been rushed to the INOVA Hospital Emergency Room and has been send today to the Dominion Hospital as doctors demanded and as the magistrate Judge order  with  72 hour temporary detention order because everyone fears he wants to end his life, at this moment at all costs.**

    **261.**     Arbin 's physical and psychological scars and wounds, and Kleots worsen condition, as a direct result of the cruelty of these defends to get rid of a family with a mentally disabled tenant, under false pretenses, might or might not improve, as life goes on, depending on what life holds ahead for each one of them but one thing seems to be sadly true that; plaintiff's kids will never heal entirely and that no amount of money will ever make them whole again and plaintiff will have to struggle, for as long as he lives, to be there for his kids.

## V.     DEMAND FOR RELIEF

THERFORE plaintiff seeks and prays that the jury will decide a fair and just and more importantly a collectable amount, against each of the defendants, for their heinous and illegal acts in violation of the fair housing laws .

As a matter of law the Court can award,

1.     *Punitive Damages* against each defendants and plaintiff asks for it.

2.     *Reasonable Attorney's Fees* and *Court Cost* and plaintiff asks it the anticipation of hiring legal representation.

3.     *ACTUAL DAMAGES,* including *humiliation, pain, and suffering* and although there is no dollar amount plaintiff knows to be the amount to make him and his family whole again, plaintiff states as demand for actual damages , 20 million dollars, hoping and preferring an *AMOUNT IN THE ALTERNATIVE,* as the jury and the Court will find right and just, for this case.

4.     Plaintiff is entitled to a jury trial and *PLAINTIFF DEMANDS A JURY TRAIL*

WHEREFORE, plaintiffs, William Whittman (pro-se), prays the relief.

Respectfully Submitted

William whittman

William Whittman